```
1                    UNITED STATES DISTRICT COURT
2                      DISTRICT OF PUERTO RICO

3    WILMA FONTAN,

4         Plaintiff,
                                        Civil No. 04-1317 (JAF)
5         v.

6    JOHN POTTER, POSTMASTER
7    GENERAL,

8         Defendant.
```

9                        **OPINION AND ORDER**

10        Plaintiff, Wilma Fontán, filed the present action against

11   Defendant, John E. Potter, Jr., in his official capacity as

12   Postmaster General of the United States of America, alleging

13   discrimination in violation of Title VII of the Civil Rights Act of

14   1964 ("Title VII"), 42 U.S.C. §§ 2000e to 2000e-17 (1994 & Supp.

15   2005), the Rehabilitation Act, 29 U.S.C. § 701 et seq. (1999 & Supp.

16   2005), and Title I of the Civil Rights Act of 1991 ("Title I"), 42

17   U.S.C. § 1981a (2003 & Supp. 2005). Docket Document No. 1. Defendant[1]

18   moves for summary judgment, claiming that: (1) Plaintiff cannot put

19   forward a prima facie Rehabilitation Act claim because she is not

20   disabled, was not qualified to perform her position without a

21   reasonable accommodation, and did not suffer discrimination;

22   (2) Plaintiff did not experience a hostile work environment or

---

[1]For clarity purposes, "Defendant" will refer to the U.S. Postal
Service, as John E. Potter, Jr., the named defendant to this action, is
sued in his official capacity and is not personally implicated in any way.

Civil No. 04-1317 (JAF)                                          -2-

1    harassment because of a disability; (3) Plaintiff's constructive

2    discharge claim is unsustainable because she failed to exhaust her

3    administrative remedies, and in any case cannot establish that she

4    was constructively discharged; and (4) Defendant did not retaliate

5    against Plaintiff for her participation in protected activity.

6    Docket Document No. 24.

7                                    I.

8                    **Factual and Procedural Synopsis**

9         Unless otherwise indicated, we derive the following factual

10   summary from the parties' respective statements of fact, which only

11   rarely diverge. Docket Documents No. 25, 39.

12        Plaintiff was a United States Postal Service ("Postal Service")

13   employee from August 4, 1984, until August 25, 2000.  From on or

14   around early 1999, Plaintiff worked as Supervisor of Customer

15   Services in the Bayamón Gardens Station, located in Bayamón, Puerto

16   Rico.  In her capacity as Supervisor, Plaintiff performed duties

17   relating to finance, preparation of reports, employee supervision,

18   and managerial tasks from 9:00 A.M. until 6:00 P.M. Plaintiff's

19   supervisor from 1999 was Luther Alston, Station Manager Customer

20   Services.

21        On April 25, 2000, Alston conferred with Plaintiff regarding an

22   incident involving the actions of a subordinate employee, Doris

23   Vázquez.  Apparently, Alston had witnessed Vázquez violating her

24   responsibilities by discarding, rather than processing, official

1  mail. Alston had salvaged it in its crumpled state and directed

2  Plaintiff to maintain possession of the discarded mail.  The parties

3  differ on the following issue: Defendant claims that Alston asked

4  Plaintiff not to raise the issue with Vázquez until Alston had had

5  the opportunity to conduct an investigation; Plaintiff claims that

6  she was directed to confront Vázquez and gauge her reaction.

7       On April 26, 2000, Plaintiff confronted Vázquez regarding her

8  discarding of official mail. The following day, Vázquez verbally

9  assaulted and threatened Miriam Nieves, another employee under

10 Plaintiff's supervision, apparently because she was upset about the

11 negative attention that she had received for having wrongfully

12 discarded mail. Alston intervened and ended the altercation, and then

13 immediately met with Plaintiff to express his displeasure that

14 Plaintiff had violated his directive not to confront Vázquez until

15 further notice.  Alston became upset at Plaintiff for mishandling the

16 situation and not understanding his directions, and for causing the

17 dispute between Vázquez and Nieves.

18      As a result of this ugly workplace meltdown, Alston called the

19 Postal Police, Plaintiff requested assistance from the agency's

20 Employee Assistance Program offices, Nieves was ordered to return to

21 her station, and Vázquez was placed on emergency off-duty status and

22 told to leave the Bayamón Gardens Station.

23      Plaintiff claims that her baseline condition of anxiety was

24 considerably exacerbated by the April 27 altercation such that the

Civil No. 04-1317 (JAF)                                                -4-

1    next morning, April 28, she did not go to work right away and went

2    instead to her treating psychiatrist, Dr. Jorge Sánchez, on an

3    emergency basis. Dr. Sánchez issued a medical certificate authorizing

4    her leave from work for the next five days.

5         Plaintiff had not warned Alston of her unscheduled trip to

6    Dr. Sánchez.  Alston transmitted a beeper message to Plaintiff

7    ordering her to come to work, but by the time she received the

8    message, she was already tardy.  Plaintiff eventually arrived at her

9    dysfunctional workplace.  Alston ignored Dr. Sánchez' sick leave

10   certificate for Plaintiff, and directed Plaintiff to work her shift.

11        The same day, April 28, 2000, Alston instructed Plaintiff to

12   prepare a warning letter to Vázquez and other related documents

13   concerning the April 27 altercation, and gave her a rough draft of

14   what he wanted to be stated in the letter.  Plaintiff disagreed with

15   Alston's version of events and his decision to discipline only

16   Vázquez, but not Nieves.  Plaintiff did not complete the documents as

17   directed, but instead went on disability leave and took the

18   unfinished documents home.

19        On or around May 1, 2000, while Plaintiff was still on

20   disability leave, Alston called Plaintiff on the telephone,

21   questioned her for her absence from work, and directed her to bring

22   the documents in completed form to work within two hours.

23        Plaintiff consulted the Postal Service's Employee Assistance

24   Program and the Labor Relations Department regarding her dispute with

Civil No. 04-1317 (JAF)                                                    -5-

1    Alston.   Following  their  recommendations,  she  issued  a  letter  of

2    warning  to  Vázquez  and  another  letter  to  Nieves  and  mailed  the

3    letters to their respective addresses.[2]

4        On May 4, 2000, Alston issued a proposed letter of warning to

5    Plaintiff  for  what  he  perceived  to  be  her  failure  to  follow

6    instructions and to discharge her supervisory duties.

7        On  May  10,  2000,  Plaintiff  underwent  surgery  related  to  a

8    bladder disorder at the Ashford Medical Center in Condado.  Alston's

9    letter of warning was received at her home on the same day. Plaintiff

10   was discharged from the hospital on May 13, 2000, but remained under

11   the care of her surgeon, Dr. Roberto Canto.

12       On  May  15,  2000,  Plaintiff  initiated  contact  with  an  Equal

13   Employment Office ("EEO") counselor in order to proceed with charges

14   against Alston.

15       Plaintiff underwent a surgery follow-up on May 19, 2000, after

16   which Dr. Canto completed a medical certificate authorizing Plaintiff

17   to remain on medical leave until June 6, 2000.

18       While on medical leave, Plaintiff received two telephone calls

19   from  her  workplace.   The  first  call  was  made  by  Ms.  Nieves,  at

20   Alston's bidding, in order to confirm that Plaintiff had received (or

21   else was at her house so that she could receive) the May 10 warning

_____

[2]Due to a lack of clarity in both statements of fact, we are unclear
whether the letter commissioned to Nieves was a warning letter and, if so,
whether this was in accordance with Alston's instructions.  Docket Document
Nos. 25, 39. We do not perceive this ambiguity as being crucial to this
case, and so will proceed with a spotless conscience.

Civil No. 04-1317 (JAF)                                        -6-

1    letter.  Alston made the second telephone call himself, advising

2    Plaintiff that she had not submitted all of the required

3    documentation to support her medical leave.

4         Plaintiff concedes that she may not have properly completed her

5    application for medical leave, but meanwhile asserts that she became

6    fearful of Alston because of the two telephone calls and, therefore,

7    changed her telephone number to avoid further unwanted contact from

8    Alston or Postal Service employees under his control.

9         Plaintiff had requested and received approval for medical leave

10   for a term expiring on May 19, 2000.  On or around May 23, 2000,

11   Plaintiff, still absent from work, sent a facsimile transmission to

12   Alston for a request for medical leave from May 13 to May 26 and from

13   May 27 to June 9.

14        On May 26, 2000, Alston sent to Plaintiff a notification warning

15   her that she was absent from duty without approved leave because her

16   approved leave from duty had expired on May 19, 2000, and directing

17   her to furnish evidence justifying her absence.  The letter warned

18   that "[f]ailure to comply with the above instructions will result in

19   your being charge [sic] AWOL [note: Absent Without Official Leave]

20   and may by followed with disciplinary action up to including removal

21   from the Postal Service." Docket Document No. 27, Exh. 5.  Also on

22   May 26, 2000, Alston denied Plaintiff's belatedly submitted May 23

23   request for authorization of continued medical leave, purportedly

24   because it was submitted belatedly and was not completed correctly.

1      Plaintiff asserts that Alston fully knew, at the time he denied

2   her request, that she was recovering from surgery and would not be

3   able to return to work until June 6, 2000.  Plaintiff also admits

4   that some of her application forms for medical leave were not

5   completed correctly, due to her medical incapacity, but maintains

6   that because Alston knew the reasons for her absence, he was

7   obligated to grant her requests and clear up any ambiguities at a

8   later time.

9      Plaintiff asserts that Alston's actions exacerbated her anxiety

10  symptoms during her convalescence, and compelled her to be

11  hospitalized at the First Pan-American Hospital, a psychiatric

12  institution, from June 1 to June 5, 2000 with a diagnosis of severe

13  depression. The depression diagnosis was drawn from the following

14  symptoms: Plaintiff isolated herself, would not eat, would not sleep

15  even with medication, lost her ability to concentrate and do small

16  tasks at home, maintained low self-esteem, suffered disabling

17  migraine headaches, lost her memory, developed an intolerance for

18  music, radio or television, and lacked the desire to care for

19  herself. From June 6 to June 21, 2000, Plaintiff received ambulatory

20  psychiatric treatment from First Pan-American Hospital.   After

21  Plaintiff's release from psychiatric care, Plaintiff's psychiatric

22  physician, Dr. Sánchez, determined that she was still unable to

23  return to work, and so granted her certification for medical leave

24  for several more weeks.  On July 7, 2000, Dr. Sánchez issued a

Civil No. 04-1317 (JAF)                                          -8-

1    medical certificate indicating Plaintiff's mental readiness to return

2    to work "with reasonable accommodation."   Docket Document No. 27,

3    Exh. 8.   Although the medical certificate did not specify an

4    accommodation, Plaintiff avers that Dr. Sánchez indicated to her,

5    when writing the certification, that the suggested accommodation

6    consisted of transferring her to another postal station, away from

7    Alston.

8        On or around July 13, 2000, Plaintiff presented a work

9    restriction evaluation form requesting accommodations due to the

10   following limitations: she could not lift more than ten pounds, bend,

11   squat, kneel, twist, climb, push, or pull; she could remain for no

12   more than eight hours in a sitting position, and could stand for no

13   more than six hours or walk no more than two hours.

14       On July 20, 2000, Plaintiff reported back to the Station but

15   found herself unable to go inside.   In a panic, she went instead to

16   see Dr. Sánchez.

17       Based on Plaintiff's continuing situation, Dr. Sánchez now

18   recommended that she be taken away from Alston's supervision and

19   relocated to a low stress, less demanding environment.   On August 1,

20   2000, Plaintiff met with Robert Vázquez ("Mr. Vázquez"), Manager of

21   Customer Service Operations, to discuss accommodation options.

22   Mr. Vázquez offered Plaintiff the possibility of relocating to any

23   one of four postal stations in the greater San Juan area: Hato Rey,

24   Santurce, Fernández Juncos, and Cupey.   Plaintiff requested transfer

1   to any available positions in the towns of Humacao, Cayey or Vega

2   Baja, but Mr. Vázquez was unable to offer positions in those

3   particular locales.  Plaintiff elected to transfer to Cupey Station

4   for a temporary assignment, and was instructed to report to work in

5   early August.

6        Plaintiff's engagement at Cupey Station was short-lived. She

7   admits to having regularly arrived for work at Cupey Station ten or

8   fifteen minutes late.  She attributes her tardiness to "sleeping

9   problems," and maintains that she was never absent.  In an affidavit,

10  Mr. Vázquez noted that regardless of his efforts to accommodate

11  Plaintiff's needs, she was "unable to sustain regularity in

12  attendance nor reporting timely to work." Docket Document No. 27,

13  Exh. 12.

14       Plaintiff was ordered to resume working at the Bayamón Gardens

15  Station under Alston's supervision, effective August 17, 2000.

16  Plaintiff alleges that Alston retaliated against her for requesting

17  accommodation by altering her schedule such that one of her days off

18  was moved from Saturday to Wednesday.  Shortly after returning to

19  work, Plaintiff was detailed to the Bayamón Pueblo Branch,

20  purportedly because the Bayamón Pueblo Branch was "behind with their

21  route management and needed support." Docket Document No. 25.  When

22  she arrived at the Bayamón Pueblo Branch, Plaintiff was assigned to

23  perform a "park and loop" route, requiring her to mount and dismount

1    a postal vehicle and walk routes during each stop.  The total amount
2    of walking exceeded Plaintiff's stated limit of two hours.

3         Plaintiff concedes that after the Bayamón Pueblo Branch manager
4    told her about the route, she did not call Alston to notify him about
5    the walking-intensive nature of the detail, but instead proceeded to
6    work.  She did, however, send Alston a note the day before going to
7    Bayamón Pueblo Branch (and before learning about the route), and she
8    also sent a letter after completing the Bayamón Pueblo Branch detail,
9    notifying Alston that the detail had required her to walk in excess
10   of her proscribed limits. The following day, Mr. Vázquez personally
11   came to the Bayamón Pueblo Branch and concluded her detail there.

12        On or about August 25, 2000, Plaintiff returned to the Bayamón
13   Gardens Station.  At some point during the day, Alston, visibly
14   upset, called her into his office to meet with her.  Alston told
15   Plaintiff that he wanted her to start clocking in and out of work so
16   that he could monitor her hours.  Plaintiff was intimidated by
17   Alston's approach: she claims that he spoke in an angry whisper and
18   with a glowering stare.  Upset, Plaintiff called her son to have him
19   pick her up from work.  Before leaving, she told Alston that she was
20   not feeling well and requested his signature in a leave request.  He
21   refused, and allegedly told her that she knew what would happen if
22   she left.

23        Regardless of Alston's threat, Plaintiff left work and went
24   directly to seek counseling with Dr. Sánchez.  Dr. Sánchez found that

1    Plaintiff was suffering another emotional crisis and was unable to

2    work.  He signed a medical certificate authorizing medical leave and

3    recommending her hospitalization.

4        On August 30, 2000, Plaintiff was scheduled to report to the

5    Postal Service Medical Unit for a fitness-for-duty meeting, in order

6    to find a solution to Plaintiff's accommodation request through

7    mediation.  Plaintiff's husband arrived at the Medical Unit to inform

8    the Postal Service that Plaintiff was unable to attend the meeting.

9    He hand-delivered a medical note from Dr. Sánchez excusing her

10   presence at the fitness-for-duty meeting.

11       Plaintiff received ambulatory psychiatric treatment at the First

12   Pan-American Hospital from September 11 to 25, 2000.  Plaintiff

13   requested from Alston annual leave in lieu of sick leave for the

14   purpose of continuing her medical treatment. Alston denied

15   Plaintiff's request and charged her with being AWOL.  Plaintiff never

16   returned to work after August 25, 2000.

17       On September 25, 2000, the Postal Service received from

18   Plaintiff an "Information for Pre-Complaint Counseling" form, dated

19   September 12, 2000.  Plaintiff also presented to the Postal Service

20   a medical note from Dr. Sánchez stating: "As was mentioned in the

21   psychiatric report of July 9, 2000, she should return to work in a

22   low stress, low demanding environment.  If she is placed under

23   stressful situation a marked deterioration is expected." Docket

24   Document No. 25, Exh. 9.

1       On October 5, 2000, a meeting took place between Mr. Vázquez,

2  Plaintiff, and Dr. Luis Echavarría Beza, Medical Officer for the

3  Postal Service in the Caribbean District.  Dr. Echavarría indicated

4  that he would need to confer with Dr. Sánchez, and so Dr. Sánchez

5  also participated via telephone conference.  Defendant avers that at

6  the meeting, Mr. Vázquez articulated the Postal Service's position

7  that reasonable accommodations were only made so that an employee

8  could comply with the essential elements of her position, that the

9  ability to handle stress was an integral part of Plaintiff's

10  position, and that, therefore, Plaintiff could not comply with the

11  supervisory functions or responsibilities required by her job.

12      Plaintiff avers that she never requested to be placed in a non-

13  supervisory position, but instead merely insisted that she be

14  relocated so that she would not have to work under Alston's

15  supervision.  As a result of the meeting, Dr. Sánchez issued another

16  medical certificate, recommending Plaintiff's relocation and also a

17  maximum eight-hour schedule that could accommodate her continued

18  pharmacological and psychotherapeutic treatment.

19      On October 6, 2000, Plaintiff sent a letter to Mr. Vázquez,

20  acknowledging the meeting that took place the day before and

21  requesting reasonable accommodation through a relocation and a work

22  assignment between 9:30 A.M. and Midnight.

23      Another telephone conference between Dr. Sánchez and

24  Dr. Echavarría occurred, followed by another meeting with

1   Dr. Echavarría, Plaintiff, and Mr. Vázquez.  Mr. Vázquez informed
2   Plaintiff that he could not find a match for her reasonable
3   accommodation request because he could not find a position with hours
4   that commenced as late as 9:30 A.M.  Mr. Vázquez recommended that
5   Plaintiff's case be referred to a reasonable accommodation committee.
6   Plaintiff claims that Mr. Vázquez stated that given her mental
7   condition and dependence on medication, allowing her to work in a
8   supervisory position would pose a threat to other employees.
9   Plaintiff also asserts that Mr. Vázquez' reasons were pretextual, as
10  there were supervisory positions available at nearby postal stations
11  that conformed to her requirements.

12      On November 13, 2000, Mr. Vázquez referred Plaintiff's case to
13  the Reasonable Accommodation Committee ("RAC").  The RAC met on
14  November 21, 2000, to discuss Plaintiff's case and recommended that
15  Mr. Vázquez and Plaintiff meet with the president of the National
16  Association of Postal Supervisors ("NAPS"), Carmen Pérez, to help
17  find a suitable position for Plaintiff.  Purportedly because of
18  Plaintiff's absence from work, Mr. Vázquez never scheduled a meeting
19  for Plaintiff to meet with Ms. Pérez.

20      On December 19, 2000, the EEO office received a formal complaint
21  from Plaintiff, dated December 1, 2000, claiming that the Postal
22  Service had: (1) failed to reasonably accommodate her; (2) denied her
23  requests for annual leave in lieu of sick leave and instead charged
24  her AWOL; and (3) from October 6, 2000, failed to assign her work

1    consistent with her disability limitations.  Plaintiff also now

2    asserts that her claims are based on the following acts by Alston:

3    (1) assigning her work outside of her medical restrictions;

4    (2) refusing to grant sick leave and leave to visit Dr. Sánchez; and

5    (3) arbitrarily changing her days off from work.

6         Plaintiff claims that "as a result of the Agency's failure to

7    reasonably accommodate . . . her mental condition worsened and she

8    was forced into retirement due to her disabilities."  She applied for

9    and received disability retirement in or around October 2002.

10        On April 14, 2004, Plaintiff filed the present action. <u>Docket</u>

11   <u>Document No. 1</u>.  She amended the complaint on April 15, 2005. <u>Docket</u>

12   <u>Document No. 12</u>.

13        Defendant moved for summary judgment on December 13, 2005.

14   <u>Docket Document No. 24</u>.  Plaintiff filed an opposition on

15   February 16, 2006. <u>Docket Document No. 38</u>.

16                                  **II.**

17        **<u>Motion for Summary Judgment Standard under Rule 56(c)</u>**

18        The standard for summary judgment is straightforward and

19   well-established.  A district court should grant a motion for summary

20   judgment "if the pleadings, depositions, answers to interrogatories,

21   and admissions on file, together with the affidavits, if any, show

22   that there is no genuine issue as to any material fact and that the

23   moving party is entitled to a judgment as a matter of law."  FED. R.

24   CIV. P. 56(c).  A factual dispute is "genuine" if it could be resolved

Civil No. 04-1317 (JAF)                                              -15-

in favor of either party, and "material" if it potentially affects
the outcome of the case. Calero-Cerezo v. U.S. Dep't of Justice, 355
F.3d 6, 19 (1st Cir. 2004).

The moving party carries the burden of establishing that there
is no genuine issue as to any material fact, though the burden "may
be discharged by 'showing'–that is, pointing out to the district
court–that there is an absence of evidence to support the nonmoving
party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986).
The burden has two components: (1) an initial burden of production
that shifts to the nonmoving party if satisfied by the moving party;
and (2) an ultimate burden of persuasion that always remains on the
moving party. Id. at 331.

The non-moving party "may not rest upon the mere allegations or
denials of the adverse party's pleading, but . . . must set forth
specific facts showing that there is a genuine issue for trial." FED.
R. CIV. P. 56(e).  Summary judgment exists "to pierce the boilerplate
of the pleadings and assess the proof in order to determine the need
for trial." Euromodas, Inc. v. Zanella, 368 F.3d 11, 17 (1st Cir.
2004) (citing Wynne v. Tufts Univ. Sch. of Med., 976 F.2d 791, 794
(1st Cir. 1992)).

### III.

### Analysis

Defendant argues that summary judgment should be awarded in its
favor because: (1) Plaintiff has failed to set forth a prima facie

1    case of disability discrimination; (2) hostile work environment;

2    (3) constructive discharge; or (4) retaliation; and (5) Plaintiff

3    failed to exhaust administrative remedies with regards to her

4    constructive discharge claim.

5    **A.   Disability Discrimination**

6         To assert a claim for failure to accommodate under the

7    Rehabilitation Act, Plaintiff must establish: (1) that she suffered

8    from a "disability" under the meaning of the statute; (2) that she

9    was a qualified individual in that she was able to perform the

10   essential functions of her job, either with or without a reasonable

11   accommodation; and (3) that, despite, the Postal Service's knowledge

12   of her disability, it did not offer a reasonable accommodation for

13   the disability.  Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6,

14   20 (1st Cir. 2004).  As Defendant asserts that Plaintiff cannot

15   establish any of the three requirements under the statute, we will

16   address each element in turn.

17        **1.   Disability**

18        The Americans with Disabilities Act ("ADA"), which is highly

19   analogous to the Rehabilitation Act except that it applies to non-

20   federal workers, defines a "disability" as either (a) physical or

21   mental impairment which substantially limits one or more of an

22   individual's major life activities; (b) a record of such impairment;

23   or (c) being regarded as having such an impairment. 42 U.S.C.

24   § 12102(2)(2003 & Supp. 2005); see also Quiles-Quiles v. Henderson,

1    439 F.3d 1, 5 (1st Cir. 2006)("[T]he liability standards are the

2    same" under the Rehabilitation Act and the ADA.); Calero-Cerezo, 355

3    F.3d at 19 ("Although . . . the ADA does not apply [in cases

4    involving federal employees], the case law construing the ADA

5    generally pertains equally to claims under the Rehabilitation Act").

6        Plaintiff bears the burden of establishing whether: (1) her

7    condition constitutes a "mental impairment"; (2) the life activities

8    upon which she relies constitute "major life activities;" and (3) the

9    impairment substantially limits the identified major life activity.

10   Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1167 (1st Cir.

11   2002)(citing Bragdon v. Abbot, 524 U.S. 624, 631 (1998); Toyota Motor

12   Mfg., Ky. Inc. v. Williams, 534 U.S. 184, 196 (2002); Lebrón-Torres

13   v. Whitehall Labs., 251 F.3d 236, 239-40 (1st Cir. 2001)).

14       Defendant does not seriously argue against the assertion that

15   Plaintiff suffers from a mental impairment.  Indeed, depression is

16   consistently recognized as a disability-qualifying mental impairment.

17   See Calero-Cerezo, 355 F.3d at 20; Craido v. IBM Corp., 145 F.3d 437,

18   442 (1st Cir. 1998).  Plaintiff's repeated hospitalization, her heavy

19   reliance on Dr. Sánchez's pharmacological and psychiatric treatment,

20   her many sick-leave absences, and her inability to sleep or eat

21   healthfully are all directly probative of a condition of depression

22   sufficiently severe to qualify as a mental impairment. Calero-Cerezo,

23   355 F.3d at 21.

1      Plaintiff avers that she was unable to sleep, eat, socialize,

2      work, concentrate, or care for herself, and that she suffered from

3      migraine headaches.   These activities- particularly eating and

4      sleeping-  have been consistently recognized as "major" for ADA and

5      Rehabilitation Act purposes. Guzman-Rosario v. United Parcel Serv.,

6      397 F.3d 6, 11 (1st Cir. 2005); Calero-Cerezo, 355 F.3d at 21;

7      Criado, 145 F.3d at 442-43; Whitney v. Greenberg, Rosenblatt, Kull &

8      Bitsoli, P.C., 258 F.3d 30, 33 n. 4 (1st Cir. 2001).   Further,

9      Plaintiff    succeeds    in    demonstrating    that    her    depression

10     "substantially" limited her ability to sleep and eat normally. See

11     Sutton v. United Air Lines, Inc., 527 U.S. 471, 480 (1999).

12     Plaintiff need not show, after all, that she literally did not eat or

13     sleep during her depressive episodes- only that these activities were

14     negatively impacted.   Defendants do not contest that Plaintiff

15     suffered from an inability to sleep and eat normally, and an

16     impairment can be considered to substantially limit a major life

17     activity even if the sufferer is still able to engage in the activity

18     to a limited extent. See Gillen v. Fallon Ambulance Serv., Inc., 283

19     F.3d 11, 22 (1st Cir. 2002).

20     The record clearly supports a finding that Plaintiff is disabled

21     within the Rehabilitation Act's cognizance.

22     **2.   Qualified Individual**

23     To be a "qualified individual" under the Rehabilitation Act,

24     Plaintiff must show that she possessed "the requisite skill,

1    experience, education, and other job-related requirements for the

2    position and, second, that she is able to perform the essential

3    functions of the position with or without a reasonable

4    accommodation." Calero-Cerezo, 355 F.3d at 22.  Defendant argues that

5    Plaintiff was unqualified. Docket Document No. 24.

6       In the present case, Plaintiff worked at the Bayamón Gardens

7    Station in a supervisory capacity.  As Supervisor, Customer Services,

8    she was responsible for overseeing carriers' departure and return,

9    ensuring that carrier trips are properly logged, stamp distribution

10   among window clerk employees, issuing financial reports, determining

11   why mail was returned to the station, solving timing and labor issues

12   to assure timely delivery of express mail, and giving support to

13   other post offices when they needed help on specific routes.

14   Plaintiff typically had eight or nine employees under her direct

15   supervision.

16       In addition to this relatively sterile list of responsibilities,

17   the uncontested facts allow us a vivid window into the demands

18   imposed by Plaintiff's supervisory position.  She was called upon to

19   play some role in the disciplining of Ms. Vázquez, a subordinate

20   employee, which we interpret as meaning that she was charged with all

21   of the pressures and demands involving personnel management typically

22   required by a supervisory position.  Additionally, we note that

23   Plaintiff's position required oversight of time-sensitive work

Civil No. 04-1317 (JAF)                                              -20-

1    projects, such as prompt delivery of express mail, that inevitably

2    create a high-pressure working environment.

3          Defendant contends that Plaintiff's anxiety was not specific to

4    her relations with Alston, but was rather a symptom of her inability

5    to handle the pressures of a supervisory role.  Defendant points out

6    that Plaintiff had experienced problems before that also stemmed from

7    supervisory pressures: in 1997, when Plaintiff first assumed a

8    supervisory role (in a temporary, rather than appointed, capacity),

9    she suffered severe anxiety relating to a poor working relationship

10   with a more senior supervisor, Ms. Ochoa.  As a result of Plaintiff's

11   reaction to her poor relationship with Ms. Ochoa, she began to see

12   Dr. Sánchez, who medicated her and gave her two weeks' recess to help

13   mitigate her condition. When Plaintiff returned to work, she recalls,

14   she spoke to her manager and it became clear that it would be better

15   for her not to remain in a supervisory position and she therefore

16   returned to her normal position as a window clerk (but was apparently

17   promoted back to supervisor at a later date).

18         Overall, the factual record available does support Defendant's

19   assertion that "working under unexpected stress or pressure is

20   inevitably present and is part of a supervisory position [at the

21   Postal Service]." Docket Document No. 24.   In refuting this

22   assertion, Plaintiff is faced with the "Catch-22" described in

23   Calero-Cerezo: "when arguing that she is a qualified individual under

24   the Act[, s]he must show both that her impairment substantially

1   limits a major life activity and that she is 'otherwise qualified'
2   for her job, meaning that she is able to perform the essential
3   functions her position requires, or would be if reasonable
4   accommodated.  In shorthand, the law requires the individual to be
5   both substantially limited and reasonably functional." 355 F.3d at
6   22.

7       Plaintiff attempts to surmount this difficulty by asserting that
8   though her "major depression substantially impaired most her major
9   life's activities," she was "able to preform her supervisory duties
10  because her mental symptoms were sufficiently under control by
11  psychiatric treatment and pharmacotherapy." Docket Document No. 42.
12  Plaintiff contends that it was Alston's "military supervisory style"–
13  his short temper and tendency to scream– that aggravated her anxiety
14  such that she could not function in the workplace without frequent
15  absences to visit Dr. Sánchez and to collect herself.

16      Plaintiff admits, however, that by September 25, 2000 (around
17  the time that she claims Defendant failed to provide an adequate
18  accommodation, thus forcing her into retirement), her "coping
19  mechanisms were deteriorated and her tolerance for stress was very
20  low . . . ." Plaintiff quotes her own physician, Dr. Sánchez, as
21  stating that "she should return to work in a low stress, low
22  demanding [sic] environment.  If she is placed under stressful
23  situation [sic] a marked deterioration is expected."  Although
24  Plaintiff's major flare-up of anxiety in April and May 2000 may

1    arguably have been aggravated by a personal incompatibility with

2    Alston, the parties agree that by the late summer and early autumn of

3    2000, her emotional stability was so compromised that Dr. Sánchez

4    recommended that she avoid not only Alston but any stressful

5    situation at all.  We do not see how a reasonable juror could find

6    that an employee incapable of handling any stress or high workplace

7    demands is qualified to fill a supervisory role such as the one

8    described herein.

9        Unlike the circuit court's finding in <u>Calero-Cerezo</u>, we do not

10   find the factual record "adequate to generate an issue for

11   consideration by a factfinder regarding Plaintiff's capacity to

12   perform her job, even while suffering her major depression, at least

13   with an appropriate accommodation." 355 F.3d at 23.   Although

14   Plaintiff's inability to establish herself as qualified for her

15   position is fatal to her Rehabilitation Act claim, we will proceed

16   with a full analysis of her claims, turning now to whether Defendant

17   offered a reasonable accommodation.

18       **3.   <u>Reasonable Accommodation</u>**

19       An employer must provide a requested reasonable accommodation

20   once aware of an employee's disability, unless it can show that the

21   proposed accommodation would pose an undue hardship for its business.

22   <u>See</u> <u>Higgins v. New balance Athletic Shoe, Inc.</u>, 194 F.3d 252, 264

23   (1st Cir. 1999).   To show that a proposed accommodation was

24   reasonable, a plaintiff must prove "not only that the proposed

1    accommodation would enable her to perform the essential functions of

2    her job, but also that, at least on the face of things, it is

3    feasible for the employer under the circumstances." Reed v. LePage

4    Bakeries, Inc., 244 F.3d 254, 259 (1st Cir. 2001).  "An adequately

5    supported denial of an accommodation request requires the employer

6    'to produce at least some modicum of evidence showing that the

7    requested accommodation would be a hardship, financial or otherwise."

8    Calero-Cerezo, 355 F.3d at 23 (quoting Ward v. Mass. Health Research

9    Inst., Inc., 209 F.3d 29, 37 (1st Cir. 2000)).

10         In the present case, the uncontested facts clearly indicate that

11   both parties actively engaged in trying to find a workable solution

12   to accommodate Plaintiff's depression and anxiety-related need to

13   work in a stress-free environment away from Alston.  On numerous

14   occasions from August to October 2000, Mr. Vázquez met with

15   Plaintiff, in conformity with the requirement that there be "a great

16   deal of communication between the employee and employer." Garcia-

17   Ayala v. Leerle Parentalss, Inc., 212 F.3d 638, 648 (1st Cir. 2000).

18   He was constrained in his search by Plaintiff's shift requirements,

19   location preferences, her need to be free from almost any meaningful

20   physical exertion whatsoever, and the need to find a supervisory

21   position that was stress-free.  Plaintiff baldly asserts that there

22   were positions available to meet her exacting specifications, but

23   there is no evidence in the record to support this contention.  In

24   contrast, Defendant demonstrates that Mr. Vázquez proffered the four

1    possibilities he could find that came closest to fitting the bill,

2    and was constrained greatly by Plaintiff's inability to begin the

3    working day before 9:30 AM.  Plaintiff even accepted one of the four

4    accommodation offers and began working at Cupey Station on August 5,

5    2000.  She admits that she was unable to arrive at work in a timely

6    fashion to her new post, and so was ordered to return to working at

7    Bayamón Gardens Station.

8        In compliance with the directive that "it may be necessary for

9    the covered entity to initiate an informal, interactive process with

10   the individual, 29 C.F.R. § 1630.2(o)(3), once Mr. Vázquez failed to

11   find a position to meet Plaintiff's needs, he referred her case to

12   RAC.  In November 2000, RAC authorized Mr. Vázquez to put Plaintiff

13   in touch with Ms. Peréz, but the undisputed fact that Plaintiff

14   disappeared from the workplace entirely after August 25, 2000

15   rendered it impossible for Mr. Vázquez to arrange a meeting.  "[B]oth

16   the employee and a responsible representative of the employer have a

17   duty to participate" in the interactive process to find a mutually-

18   satisfactory accommodation. Calero-Cerezo, 355 F.3d at 24.  Plaintiff

19   makes no showing that she continued to engage with Mr. Vázquez after

20   her case's reference to the RAC.

21       During late 2000, Plaintiff did apply for another position with

22   the Postal Service, for which she was rejected.  However Defendant

23   was not obligated to offer Plaintiff a particular position simply

24   because Plaintiff found the working hours to be desirable.  Rather,

Civil No. 04-1317 (JAF)                                                -25-

1    Defendant was fully entitled to decline Plaintiff's application if,

2    for instance, Plaintiff was not deemed qualified for the position.

3    We take it at face-value that requiring an employer to assign an

4    employee to a position for which she is unqualified merely because it

5    fits her bill for a reasonable accommodation would be an "undue

6    hardship" to the employer, and thus exempt from the Rehabilitation

7    Act's demands.  See Reed, 244 F.3d at 259.

8         In short, the record shows that while Plaintiff was disabled

9    within the Rehabilitation Act's cognizance, her intolerance for

10   stress rendered her unqualified to perform the essential functions of

11   her job, and, even were she qualified, the record clearly shows that

12   Mr. Vázquez actively tried to find an accommodation that would

13   satisfy Plaintiff's many demands.

14   **B.   <u>Hostile Work Environment</u>**

15   <u>      </u> To establish a hostile work environment, Plaintiff must show

16   that her "workplace was permeated with discriminatory intimidation,

17   ridicule, and insult that [was] sufficiently severe or pervasive to

18   alter the conditions of . . . [her] employment and create an abusive

19   working environment." <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21

20   (1993); <u>Quiles-Quiles v. Henderson</u>, 439 F.3d 1, 7 (1st Cir.

21   2006)(assessing hostile work environment claim under the

22   Rehabilitation Act).  Relevant are "the severity of the conduct, its

23   frequency, and whether it unreasonably interfered with the victim's

24   work performance." <u>Quiles-Quiles</u>, 439 F.3d at 7.  Plaintiff must

Civil No. 04-1317 (JAF)                                              -26-

1   demonstrate that "the workplace was both subjectively and objectively

2   hostile." Mannie v. Potter, 394 F.3d 977, 982 (7th Cir. 2005).

3          This case features an utter lack of supporting evidence of

4   treatment "that a reasonable person would find hostile or abusive."

5   Id.      The key incidents involving Alston– that is, those

6   confrontations that prompted Plaintiff to leave the workplace for

7   psychiatric treatment with Dr. Sánchez– may at the most convey that

8   Alston possessed an abrasive managerial style, but contain no hint of

9   "ridicule" or maliciousness.    Id.; see also Oncale v. Sundowner

10  Offshore Servs., Inc., 523 U.S. 75, 81 (1998)(finding that federal

11  employment discrimination laws do not establish a "general civility

12  code" for the workplace); cf. Arrieta-Colon v. Wal-Mart P.R., Inc.,

13  434 F.3d 75, 88 (1st Cir. 2006)(affirming disability harassment

14  verdict where the evidence showed that plaintiff was subject to

15  "constant mockery" due to his disability).    Even were we to

16  characterize Alston's conduct has hostile, there is no evidence on

17  record suggesting that it was directed at Plaintiff "because of a

18  characteristic protected by a federal anti-discrimination statute."

19  Quiles-Quiles, 439 F.3d at 7-8.

20  **C.   Constructive Discharge**

21          Defendant argues that Plaintiff did not exhaust her

22  administrative remedies as to a constructive discharge claim, and in

23  any case, is unable to make a prima facie showing that a constructive

24  discharge occurred.    Because we find that Plaintiff did not exhaust

1   her administrative remedies, we will not address the issue on its

2   merits.

3        Like all federal anti-discrimination employment laws, the

4   Rehabilitation Act requires administrative exhaustion, and issues

5   that did not appear within the scope of an administrative process may

6   not be touched upon in a subsequent federal action. Roman-Martinez v.

7   Runyon, 100 F.3d 213, 219-20 (1st Cir. 1996); see also Jensen v.

8   Frank, 9212 F.2d 517, 520 (1st Cir. 1990)("Title VII requires

9   exhaustion of administrative remedies as a condition precedent to

10  suit in federal district court."). Since Plaintiff does not dispute

11  that the constructive discharge claim did not appear in her

12  administrative complaint, it is dismissed.

13  **D.   Retaliation**

14       The Rehabilitation Act "prohibits retaliation against employees

15  for complaining about violations of the Act." Quiles-Quiles v.

16  Henderson, 439 F.3d 1, 8 (1st Cir. 2006); see also 29 U.S.C. § 791.

17  A plaintiff must establish that: (1) she engaged in protected

18  conduct; (2) she experienced an adverse employment action; and (3)

19  there was a causal connection between the protected conduct and the

20  adverse employment action. Quiles-Quiles, 439 F.3d at 8. The

21  creation of a hostile work environment— or the intensification of a

22  pre-existing hostile environment— can satisfy the adverse employment

23  action requirement. Id.; Noviello v. Boston, 398 F.3d 76, 89 (1st

24  Cir. 2005).

1        In considering a retaliation claim, the relevant conduct is

2   that which occurred after Plaintiff complained. Quiles-Quiles, 439

3   F.3d at 8.  Plaintiff provides the most meager of allegations as to

4   conduct that intensified after she initiated a disability complaint.

5   In speaking to Plaintiff in a low and threatening voice and

6   requesting that Plaintiff clock her hours, Alston conveyed nothing

7   more than a predictable level of frustration at Plaintiff's almost

8   constant absences from work and inability to handle work-related

9   stress.   While possibly insensitive, Alston's actions cannot be

10  considered as retaliatory under any light, especially as Plaintiff

11  concedes that he was abrasive before she engaged in protected

12  activity and, in fact, was abrasive with nearly all of his

13  subordinates.  There is no evidence available to suggest that Alston

14  or Vázquez assigned Plaintiff to the Bayamón Pueblo detail with the

15  knowledge that the work would require her to exceed her physical

16  limitations.   Indeed, Plaintiff concedes that Vázquez responded

17  instantaneously, upon learning of the problem, by removing her from

18  the detail.  Similarly, we are unmoved by Plaintiff's complaint that

19  Alston changed her schedule upon her return to the Bayamón Garden

20  Station; inconvenient scheduling alone does not represent an adverse

21  employment action, especially absent any showing of a causal

22  connection between the protected activity and the scheduling problem.

23  See, e.g., Long v. First Union Corp. of Va., 894 F. Supp. 933, 944

24  (E.D.Va. 1995)(holding that employee failed to establish retaliatory

Civil No. 04-1317 (JAF)                                          -29-

1   constructive discharge when supervisor refused to alter her work

2   schedule to accommodate her educational needs and had adjusted other

3   workers' schedules).

4          We find no evidence upon which a trier of fact could conclude

5   that Plaintiff was penalized for engaging in protected conduct.

6                                    **IV.**

7                                **<u>Conclusion</u>**

8          In accordance with the foregoing, we **GRANT** Defendant's motion

9   for summary judgment.  <u>Docket Document No. 24</u>.  Plaintiff's claims

10  are **DISMISSED WITH PREJUDICE.**  Judgment shall be entered accordingly.

11         **IT IS SO ORDERED.**

12         San Juan, Puerto Rico, this 12th day of June, 2006.

13                                   S/José Antonio Fusté
14                                    JOSE ANTONIO FUSTE
15                                   Chief U.S. District Judge